WALLACE, Secretary of Agriculture, et al.
v. CURRIN et al.
No. 4224.

Circuit Court of Appeals, Fourth Circuit.
April 5, 1938.

Morris R. Clark, Sp. Asst. to Atty. Gen., and John H. Manning, Asst. U. S. Atty., of Raleigh, N. C. (Robert H. Jackson, Asst. Atty. Gen., Hugh B. Cox and Robert L. Stern, Sp. Assts. to Atty. Gen., and J. O. Carr, U. S. Atty., of Wilmington, N. C., on the brief), for appellants.

B. S. Royster, Jr., of Oxford, N. C. (Royster & Royster, of Oxford, N. C., on the brief), for appellees.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal from a decree enjoining officials of the Department of Agriculture and the United States Attorney for the Eastern District of North Carolina from enforcing the provisions of the Tobacco Inspection Act of August 23, 1935, 7 U.S.C.A. § 511 et seq. The appellees, complainants below, are warehousemen operating tobacco auction warehouses in Oxford, North Carolina. Four questions are presented by the appeal: (1) Whether complainants have any standing under the facts as shown to ask the relief prayed; (2) whether the act is a valid regulation of interstate commerce or void as an invasion of the reserved power of the states; (3) whether the act is void as an unconstitutional delegation of legislative power to the Secretary of Agriculture or to the growers of tobacco; and (4) whether the act violates the due process clause of the Fifth Amendment.

Sales of tobacco are conducted throughout the tobacco growing sections of the United States according to the same general plan, which is as follows: After the tobacco has been cured and is ready for marketing, the grower grades it as best he can, arranges it in bundles and hauls it to the auction warehouse. It is unloaded at the warehouse and bundles or "hands" of tobacco are placed in baskets and weighed under the supervision of a warehouse employee. A ticket is placed on each pile, giving the name of the owner, the number of pounds of tobacco in the pile, and spaces for the name of the buyer and the price paid. The baskets are arranged in rows with a passageway between, and buyers may then come on the floor and inspect it. Sales are by auction and are conducted with great rapidity, the minimum speed being 360 baskets per hour, or one basket every ten seconds. As soon as a sale is made, a ticket marker places the name of the buyer and the price paid on the ticket. The grower may reject the bid and have the tobacco resold or withdraw it from the warehouse, but unless this is done promptly the buyer removes it and the sale is complete. Because of the speed with which the sale is conducted, there are many errors in grading which are prejudicial to the grower whose tobacco is being sold and who is generally without the technical knowledge of grading necessary for the protection of his own interest.

To remedy this evil, by establishing and promoting the use of standards of classification and by maintaining an official inspection service and grading the tobacco in advance of sale, as well as by furnishing to the grower information of the market price being paid for tobacco of the several grades, was the purpose of the act of Congress here under consideration. See Townsend v. Yeomans, 301 U.S. 441, 452, 57 S.Ct. 842, 847, 81 L.Ed. 1210. This was expressed in Report No. 1102 of the 74th Congress, First Session, as follows:

"The first provision of the bill, which applies to tobacco sold on what are known as auction markets, has for its objects (1) the grading of the growers' tobacco by government graders before sale so they will know what grades they are offering for sale, and (2) furnishing the growers with a daily and weekly market news service so they will know what the different grades of tobacco are bringing, and thus put them in position intelligently to accept or reject sales.

"In order to understand the real objects of this first provision of the bill it is thought that a short statement of the present auction system of selling tobacco is in order. Tobacco is the only major farm crop which is sold at auction. In many localities, particularly in Virginia, North Carolina, South Carolina, Georgia, Florida, West Virginia, and Maryland, and in certain sections of Tennessee, Kentucky, Ohio, Indiana, and Missouri there is no other method of selling tobacco available to growers.

"Tobacco, under the auction system as now conducted, is sold in baskets containing from 10 to 200 or more pounds. These baskets are placed upon the warehouse floor in long rows and the tobacco is sold to the highest bidder at public auction by the warehouseman, who operates on a fee or commission basis and who is supposed to represent the tobacco grower. The sales are made without the grades of the several lots being first determined and without the grower knowing what the same grades are bringing. The selling is extremely rapid, being at a rate, on most markets, of one basket every 10 seconds. The purchasers are the representatives of the tobacco companies and speculators, commonly called 'pin-hookers', who are experts in the grades of tobacco. There are between 60 and 100 grades in a single type of tobacco, and it is not practical for a farmer to familiarize himself with the technical factors on which these grades are based, or to keep informed as to market prices without a definite system of Government grades.

"Without any standard or guide, farmers sort their tobacco for market, as best they can, into lots of like quality, color, and length, which they commonly refer to as 'grading'. However, the farmer has no definite system of grades of his own, and the private grading systems used by the buyers are kept strictly confidential by them, so without Government standards the farmer has no definite guide for sorting his tobacco. Without a definite standard for sorting, or 'grading' as the farmers call it, farmers generally are unable to class their tobacco correctly to meet the trade's demand. Buyers frequently refuse to bid on lots of tobacco due to the fact that it is not properly sorted. Improperly sorted lots of tobacco usually command a much smaller price as compared with prices paid for tobacco which is uniformly sorted into lots. Many lots of tobacco after being bought are re-sorted by the buyer into two or three different grades.

"The possession of grade and price information by the buyers, and the lack of it on the part of the growers, places the growers under a severe handicap in the marketing of their tobacco and opens the way to abuses and practices by which farmers are victimized. The picture is simply this: Here is a farmer offering his tobacco for sale through a warehouse at the rate of a basket every 10 seconds, at public auction, to the highest bidder, without the grade being first established and without knowing what similar tobacco is bringing. On the other hand we have the purchaser who is an expert judge of tobacco, who has a well-established private system of grades, and who is in possession of all available information with respect to quality and price. It is the thought of the committee that if the purchaser needs an expert in grades in order to protect his interest in the sale the grower should be accorded the same protection."

The act, in addition to providing for the establishing of official standards for grading tobacco and for distributing information relative to market supply, demand, and prices, provides for free inspection in those markets in which tobacco moves in interstate commerce and which have been designated by the Secretary of Agriculture to receive the inspection service. The Secretary is authorized to designate for this service auction markets where tobacco moves in commerce, and commerce within the meaning of the act is defined by section 1 (i) thereof, 7 U.S.C.A. § 511 (i), as follows: "'Commerce' means commerce between any State, Territory, or possession, or the District of Columbia, and any place outside thereof; or between points within the same State, Territory, or possession, or the District of Columbia, but through any place outside thereof; or within any Territory or possession, or the District of Columbia. For the purposes of this chapter (but not in any wise limiting the foregoing definition) a transaction in respect to tobacco shall be considered to be in commerce if such tobacco is part of that current of commerce usual in the tobacco industry whereby tobacco or products manufactured therefrom are sent from one State with the expectation that they will end their transit, after purchase, in another, including, in addition to cases within the above general description, all cases where purchase or sale is either for shipment to another State or for manufacture within the State and the shipment outside the State of the products resulting from such manufacture." Before any market may be designated by the Secretary he is required to take a referendum vote of the growers who sold tobacco on the market during the preceding marketing season, and he is forbidden to desig-

nate any market for the service unless two-thirds of the growers voting in the referendum favor it. Section 5 of the act, 7 U.S.C.A. § 511d, which is the one pertinent to the question here presented, is as follows: "[Sec. 5.] The Secretary is authorized to designate those auction markets where tobacco bought and sold thereon at auction, or the products customarily manufactured therefrom, moves in commerce. Before any market is designated by the Secretary under this section he shall determine by referendum the desire of tobacco growers who sold tobacco at auction on such market during the preceding marketing season. The Secretary may at his discretion hold one referendum for two or more markets or for all markets in a type area. No market or group of markets shall be designated by the Secretary unless two-thirds of the growers voting favor it. The Secretary shall have access to the tobacco records of the Collector of Internal Revenue and of the several collectors of internal revenue for the purpose of obtaining the names and addresses of growers who sold tobacco on any auction market, and the Secretary shall determine from said records the eligibility of such grower to vote in such referendum, and no grower shall be eligible to vote in more than one referendum. After public notice of not less than thirty days that any auction market has been so designated by the Secretary, no tobacco shall be offered for sale at auction on such market until it shall have been inspected and certified by an authorized representative of the Secretary according to the standards established under this Act, [chapter] except that the Secretary may temporarily suspend the requirement of inspection and certification at any designated market whenever he finds it impracticable to provide for such inspection and certification because competent inspectors are not obtainable or because the quantity of tobacco available for inspection is insufficient to justify the cost of such service: Provided, That, in the event competent inspectors are not available, or for other reasons, the Secretary is unable to provide for such inspection and certification at all auction markets within a type area, he shall first designate those auction markets where the greatest number of growers may be served with the facilities available to him. No fee or charge shall be imposed or collected for inspection or certification under this section at any designated auction market. Nothing contained in this Act [chapter] shall be construed to prevent transactions in tobacco at markets not designated by the Secretary or at designated markets where the Secretary has suspended the requirement of inspection or to authorize the Secretary to close any market."

Section 11 of the act, 7 U.S.C.A. § 511j, makes any violation of section 5 a misdemeanor punishable by fine of not more than $1,000 or imprisonment of not more than one year, or both.

There are forty auction tobacco markets in North Carolina; and in the year 1936 three of these were designated for inspection service under the act, Oxford, Farmville, and Goldsboro. A referendum was held with respect to the Smithfield, N. C., market, but a majority of the votes cast were against the service. The markets at Henderson, twelve miles distant from Oxford, and Durham, thirty miles distant, were not designated. The reason for the designation of the Oxford and Goldsboro markets seems to have been that free, but not compulsory, inspection and grading service had been maintained by the Secretary at these markets prior to the passage of the act. As to the character of the commerce at that market, it appears that the larger part of the tobacco there purchased is for shipment beyond the state and that the remainder is purchased by large manufacturers whose products are sold in interstate commerce. It appears that during the week ending October 29, 1936, 2,105,305 pounds of tobacco were sold on the Oxford market, of which only 15 per cent. was definitely destined for manufacture in North Carolina. An additional 16 per cent. was purchased by manufacturers having plants in both North Carolina and Virginia, and the remaining 69 per cent. was for shipment beyond the state, 62.4 per cent. thereof being for export. These figures are typical of the interstate character of the tobacco business. In 1935, there were 573,000,000 pounds of flue-cured tobacco grown in North Carolina of which 21 per cent. was manufactured within the state and the remaining 79 per cent. shipped beyond its borders. The evidence further shows that prior to the completion of the sale of a pile of tobacco no distinction or separation is made between tobacco which will be purchased for manufacture within the

state and that which will be purchased for out of state manufacturers. Buyers representing nonresident dealers and manufacturers are present throughout the sale to bid on such of the lots offered as they may desire to purchase; and not until the sale of a particular pile is completed can it be determined whether or not it has been purchased for transportation in interstate commerce.

On the interest of the complainant warehousemen in the controversy, it appears that the tobacco sold belongs to the growers, and not to them, and that, for conducting the sales in their warehouses, they receive a compensation fixed by the law of North Carolina, which is 10 cents per 100 pounds as a weighing fee, 15 cents per 100 pounds as an auctioneer's fee, and 2½ per cent. of the money realized on the sale. The extra printing on tickets required by the act will involve a slight expense, around $25 for each of the complainants for the season. They contend that they have lost business as a result of the enforcement of the act, and will lose business if it is enforced, by reason of the fact that some growers are opposed to government inspection and will take their tobacco to other markets rather than submit to it; and, as further evidence of the loss which the act will inflict upon them, they point to the fact that, after the preliminary injunction granted by the court below went into effect and freed them of the inspection, the average prices received by them were higher than the average prices received by competing warehousemen on the same market who were subject to the inspection. Against this, it appears that after the injunction was issued the noncomplaining warehousemen, who continued to have the government inspection, received a much larger share of the business of the Oxford market than they had been receiving theretofore, and that the complaining warehousemen received a much smaller share.

Coming to the first question presented by the appeal, i. e., the standing of complainants to maintain the suit, it is difficult to see that they have sustained, or can sustain, any substantial damage as a result of the enforcement of the act. The matter of difference in prices on which they rely has little probative value, as it may have been due to a variety of circumstances; and we do not see how correct grading can result otherwise than in better prices for the growers and consequently in increased commissions for the warehousemen. The loss of business from growers who do not desire the inspection would seem to be shown by the record to be more than counterbalanced by the gain of business from those who do desire it; and, certainly, the slight additional expense involved in the printing of tickets is hardly sufficient of itself to justify injunctive relief.

We do not think, however, that for these reasons we would be justified in holding that complainants are without standing to question the act. If it is unconstitutional, as they contend, they have a right to operate their business without complying with it; and, if they should attempt to do this, they would incur penalties which would be ruinous to them in the event that it should be upheld. Under such circumstances they are entitled to injunctive relief if the court is of opinion that it is unconstitutional. Ex parte Young, 209 U.S. 123, 146, 28 S.Ct. 441, 52 L.Ed. 714, 13 L.R.A.,N.S., 932, 14 Ann. Cas. 764; Stafford v. Wallace, 258 U.S. 495, 512, 42 S.Ct. 397, 400, 66 L.Ed. 735, 23 A.L.R. 229; Terrace v. Thompson, 263 U.S. 197, 215, 44 S.Ct. 15, 18, 68 L.Ed. 255; Tyson & Brother United Theatre Ticket Offices v. Banton, 273 U.S. 418, 428, 47 S.Ct. 426, 427, 71 L.Ed. 718, 58 A.L.R. 1236. If it be argued that they would sustain little damage by complying with the act, the answer is that one need not comply with an act if it be unconstitutional, and should not be required to abandon what he believes to be his right because a mistake in judgment in that regard might prove ruinous to him. In addition to this, there is unquestionably an actual controversy between the parties entitling complainants to relief under that salutary statute of recent enactment, the Declaratory Judgment Act, Jud.Code § 274 d, as amended, 28 U.S.C.A. § 400. Ætna Life Ins. Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617, 108 A.L.R. 1000; Stephenson v. Equitable Life Assur. Soc., 4 Cir., 92 F.2d 406, 409.

We come then to the second question, i. e., whether the act can be upheld under the commerce clause of the Constitution, article 1, § 8, cl. 3, or must be condemned as an invasion of the reserved powers of the states. On this question, it

is important to note that the provision of the statute of which complaint is made does not require the government inspection or grading of tobacco, but merely forbids tobacco being offered for sale at auction upon a designated market without such inspection and grading. See section 5, 7 U.S.C.A. § 511d, supra. It is thus a regulation of the auction sale of tobacco on markets where it is purchased in interstate commerce; and such regulation is clearly within the power of Congress under the commerce clause of the Constitution. As said by the Supreme Court in Shafer v. Farmers' Grain Co., 268 U.S. 189, 198, 45 S.Ct. 481, 485, 69 L.Ed. 909: "Buying for shipment, and shipping, to markets in other states when conducted as before shown constitutes interstate commerce—the buying being as much a part of it as the shipping." And it may be said of tobacco here, as it was of wheat in that case, that it "is a legitimate article of commerce and the subject of dealings that are nation-wide. The right to buy it for shipment, and to ship it, in interstate commerce, is not a privilege derived from state laws, and which they may fetter with conditions, but is a common right, the regulation of which is committed to Congress and denied to the states by the commerce ·clause of the Constitution." In that case a state statute requiring the grading of wheat at country elevators, 90 per cent. of which was purchased for shipment in interstate commerce, was held void as "a direct regulation of the buying of grain in interstate commerce, and therefore invalid." To like effect are Lemke v. Farmers' Grain Co., 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 458, and Dahnke-Walker Milling Co. v. Bondurant, 257 U.S. 282, 42 S.Ct. 106, 108, ·66 L.Ed. 239. In the case last cited the doctrine here applicable was well stated by Mr. Justice Vandeventer as follows: "The commerce clause of the Constitution (article 1, § 8, cl. 3) expressly commits to Congress and impliedly withholds from the several states the power to regulate commerce among the latter. Such commerce is not confined to transportation from one state to another, but comprehends all commercial intercourse between different states and all the component parts of that intercourse. Where goods in one state are transported into another for purposes of sale, the commerce does not end with the transportation, but embraces as well the sale of the goods after they reach their destination and while they are in the original packages. Brown v. Maryland, 12 Wheat. 419, 446, 447, 6 L.Ed. 678; American Steel & Wire Co. v. Speed, 192 U.S. 500, 519, 24 S.Ct. 365, 48 L.Ed. 538. On the same principle, where goods are purchased in one state for transportation to another, the commerce includes the purchase quite as much as it does the transportation. American Express Co. v. Iowa, 196 U.S. 133, 143, 25 S.Ct. 182, 49 L.Ed. 417. This has been recognized in many decisions construing the commerce clause. * * * In no case has the court made any distinction between buying and selling or between buying for transportation to another state and transporting for sale in another state. Quite to the contrary, the import of the decisions has been that, if the transportation was incidental to buying or selling, it was not material whether it came first or last."

In Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 401, 66 L.Ed. 735, 23 A.L.R. 229, the Supreme Court sustained the Packers and Stockyards Act of 1921, 42 Stat. 159, 7 U.S.C.A. § 181 et seq., which regulated sales of live stock in stockyards, and the object of which as defined by the court was to secure "the free and unburdened flow of live stock from the ranges and farms of the West and the Southwest through the great stockyards and slaughtering centers on the borders of that region, and thence in the form of meat products to the consuming cities of the country in the Middle· West and East, or, still as live stock, to the feeding places and fattening farms in the Middle West or East for further preparation for the market." The court found that the stockyards were "but a throat through which the current [of commerce] flows," which is true of the auction tobacco markets with which we are dealing, and made no distinction between the purchase of animals for local conversion into meat products which were to be sold in interstate commerce and purchases for further transportation and fattening. It based its decision in large measure upon the decision in Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518, and quoted therefrom with approval the following passage: "Commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business. When cattle are sent for sale from a place in one state,

with the expectation that they will end their. transit, after purchase, in another, and when in effect they do so, with only the interruption necessary to find a purchaser at the stockyards, and when this is a typical, constantly recurring course, the current thus existing is a current of commerce among the states, and the purchase of the cattle is a part and incident of such commerce."

In Krueger v. Acme Fruit Co., 5 Cir., 75 F.2d 67, 68, the Circuit Court of Appeals of the Fifth Circuit upheld the provision of the Perishable Agricultural Commodities Act of 1930, 7 U.S.C.A. § 551, et seq., now 7 U.S.C.A. § 499a et seq., which conferred upon the Secretary of Agriculture power to make reparation orders arising out of a sale made in interstate commerce. The court, speaking through the late Judge Bryan, said: "It [the act] does, however, assume jurisdiction over a dealer while he is engaged in buying agricultural commodities in interstate commerce; and that it may do so under the commerce clause of the Federal Constitution we entertain no doubt (Const. art. 1, § 8, cl. 3.) * * * The purchase of a commodity for shipment from one state to another is as much a part of interstate commerce as the transportation or sale at destination."

See, also, Foster-Fountain Packing Co. v. Haydel, 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147, Flanagan v. Federal Coal Co., 267 U.S. 222, 45 S.Ct. 233, 69 L.Ed. 583, and Townsend v. Yeomans, 301 U.S. 441, 57 S.Ct. 842, 81 L.Ed. 1210, the case last cited dealing with a Georgia statute regulating the fees of tobacco warehousemen, but inferentially treating as valid the act here under consideration.

And we do not think that the fact that a small part of the tobacco sold on an auction tobacco market, such as that at Oxford, N. C., is destined for local manufacture or even for local consumption affects the power of Congress to regulate the sales which take place there. Not only is such a market a throat through which all of the tobacco sold enters the stream of interstate commerce, either immediately or after local manufacture in the form of tobacco products (cf. Stafford v. Wallace, supra), but it also appears that by far the greater part of it is purchased for immediate transportation in interstate commerce, and that the manner of sale is such

that it would be impossible for Congress to regulate the sale of this part without regulating at the same .time the sale of that destined for local manufacture. No one can tell until a pile of tobacco is sold to the highest bidder whether it will be bought by a buyer for a local or for a foreign manufacturer; and if the sale is to be regulated with respect to the foreign buyer, it must be regulated with respect to the local buyer also. It is well settled that the power of Congress to regulate a matter affecting interstate commerce is not to be denied because such control may involve also a regulation of some commerce which is intrastate. Dealing with this very question in Stafford v. Wallace, supra, the Supreme Court said: "The application of the commerce clause of the Constitution in the Swift Case was the result of the natural development of interstate commerce under modern conditions. It was the inevitable recognition of the great central fact that such streams of commerce from one part of the country to another which are ever flowing are in their very essence the commerce among the states and with foreign nations which historically it was one of the chief purposes of the Constitution to bring under national protection and control. This court declined to defeat this purpose in respect of such a stream and take it out of complete national regulation by a nice and technical inquiry into the non-interstate character of some of its necessary incidents and facilities when considered alone and without reference to their association with the movement of which they were an essential but subordinate part."

In the Minnesota Rate Cases, 230 U.S. 352, 399, 33 S.Ct. 729, 739, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann.Cas.1916A, 18, the court succinctly stated the applicable rule as follows: "The authority of Congress extends to every part of interstate commerce, and to every instrumentality or agency by which it is carried on; and the full control by Congress of the subjects committed to its regulation is not to be denied or thwarted by the commingling of interstate and intrastate operations. This is not to say that the nation may deal with the internal concerns of the state, as such, but that the execution by Congress of its constitutional power to regulate interstate commerce is not limited by the fact that intrastate transactions may

864

have become so interwoven therewith that the effective government ,of the former incidentally controls the latter. This conclusion necessarily results from the supremacy of the national power within its appointed sphere."

In the Shreveport Case, Houston, E. & W. T. R. Co. v. United States, 234 U.S. 342, 34 S.Ct. 833, 836, 58 L.Ed. 1341, the Supreme Court upheld an order of the Interstate Commerce Commission affecting intrastate rates, holding that Congress had power to regulate even the intrastate charges of a carrier when necessary to its regulation of interstate commerce. The court said: "Congress is empowered to regulate,—that is, to provide the law for the government of interstate commerce; to enact 'all appropriate legislation' for its 'protection and advancement' (The Daniel Ball, 10 Wall. 557, 564, 19 L.Ed. 999); to adopt measures 'to promote its growth and insure its safety' (County of Mobile v. Kimball, 102 U.S. 691, 26 L.Ed. 238); 'to foster, protect, control, and restrain' (Second Employers' Liability Cases, 223 U.S. 1, 32 S.Ct. 169, 56 L.Ed. 327, 38 L.R.A. (N.S.) 44). *Its authority, extending to these interstate carriers as instruments of interstate commerce, necessarily embraces the right to control their operations in all matters having such a close and substantial relation to interstate traffic that the control is essential or appropriate to the security of that traffic, to the efficiency of the interstate service, and to the maintenance of conditions under which interstate commerce may be conducted upon fair terms and without molestation or hindrance.* As it is competent for Congress to legislate to these ends, unquestionably it may seek their attainment by requiring that the agencies of interstate commerce shall not be used in such manner as to cripple, retard, or destroy it. The fact that carriers are instruments of intrastate commerce, as well as of interstate commerce, does not derogate from the complete and paramount authority of Congress over the latter, or preclude the Federal power from being exerted to prevent the intrastate operations of such carriers from being made a means of injury to that which has been confided to Federal care. *Wherever the interstate and intrastate transactions of carriers are so related that the government of the one involves the control of the other, it is Congress, and* *not the state, that is entitled to prescribe the final and dominant rule,* for otherwise Congress would be denied the exercise of its constitutional authority, and the state, and not the nation, would be supreme within the national field." (Italics ours.)

The rule was thus stated by the Chief Justice in the very recent case of A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 544, 55 S.Ct. 837, 849, 79 L. Ed. 1570, 97 A.L.R. 947: "The power of Congress extends, not only to the regulation of transactions which are part of interstate commerce, but to the protection of that commerce from injury. It matters not that the injury may be due to the conduct of those engaged in intrastate operations. Thus, Congress may protect the safety of those employed in interstate transportation, 'no matter what may be the source of the dangers which threaten it.' Southern Ry. Co. v. United States, 222 U.S. 20, 27, 32 S.Ct. 2, 56 L.Ed. 72. We said in Second Employers' Liability Cases, 223 U.S. 1, 51, 32 S.Ct. 169, 56 L. Ed. 327, 38 L.R.A.,N.S., 44, that it is the 'effect upon interstate commerce,' not 'the source of the injury,' which is 'the criterion of congressional power.' We have held that, in dealing with common carriers engaged in both interstate and intrastate commerce, the dominant authority of Congress necessarily embraces the right to control their intrastate operations in all matters having such a close and substantial relation to interstate traffic that the control is essential or appropriate to secure the freedom of that traffic from interference or unjust discrimination and to promote the efficiency of the interstate service."

The question of the power of Congress to regulate phases of a business which are purely intrastate in character where necessary to the proper regulation and control of interstate business was recently before this court in the case of Virginian Ry. Co. v. System Federation No. 40, 4 Cir., 84 F.2d 641, wherein, after an extended review of the applicable authorities, we upheld the National Railway Labor Act, as amended, 45 U.S.C.A. § 151 et seq., as applied to the back shop employees of the Virginian Railway. In affirming our decision on this point, the Supreme Court, speaking through Mr. Justice Stone, said' (300 U.S. 515, at page 556, 57 S.Ct. 592, 603, 81 L.Ed. 789): "The activities in which these employees are engaged have

such a relation to the other confessedly interstate activities of the petitioner that they are to be regarded as a part of them. All taken together fall within the power of Congress over interstate commerce." The regulation of matters affecting intrastate as well as interstate commerce under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., has recently been sustained on the same principle. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 38, 57 S.Ct. 615, 624, 81 L.Ed. 893, 108 A.L.R. 1352; National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 301 U.S. 58, 72, 57 S.Ct. 645, 646, 81 L.Ed. 921; Jeffery-De Witt Insulator Co. v. National Labor Relations Board, 4 Cir., 91 F.2d 134, 140, 112 A.L.R. 948.

On the third question, i. e., whether the act must be condemned as an unlawful delegation of power either to the Secretary of Agriculture or to the growers, it is to be observed that the provision of which complaint is made is that which forbids the sale on designated markets of tobacco which has not been inspected; and it is clear that, as to this, there is no delegation of power to anyone. What is delegated to the Secretary of Agriculture is the designation of the markets which are to have the free government inspection and grading service and as to which the provisions of the act protecting that service and providing for sales in accordance therewith are to apply; and we see no more objection to this than to delegation by Congress of authority to the Administrator of Public Works to designate the projects for loans and grants under the Public Works Program. See Greenwood County v. Duke Power Co., 4 Cir., 81 F.2d 986, 994; Duke Power Co. v. Greenwood County, 4 Cir., 91 F.2d 665, 673. It was manifestly impossible for Congress itself to set up an inspection and grading service. This was an administrative matter for the executive department which would necessarily be limited in the performance of the duty by the number of trained inspectors available and by the money appropriated for the purpose. Realizing this, and foreseeing that the installation of the service would necessarily be a rather slow process, Congress made a comparatively small appropriation for the service and delegated to the Commissioner the duty of installing it in those markets "where the greatest number of

growers may be served with the facilities available." As the inspection would manifestly be of little value where it was not favored by the growers themselves, Congress imposed as a condition of its installation on any market that it be approved by a two-thirds vote of those voting in a referendum of the growers who had sold tobacco on that market during the preceding marketing season. We think that this was but the delegation to the Secretary of the working out of the details of a policy approved by Congress and that the act itself sufficiently indicates the standards by which the discretion vested was to be exercised, i. e., so as to serve the greatest possible number of growers with the facilities and within the appropriation available, and to limit the service to the growers who really desired it. Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294; Union Bridge Co. v. United States, 204 U.S. 364, 365, 27 S.Ct. 367, 51 L.Ed. 523; United States v. Grimaud, 220 U. S. 506, 31 S.Ct. 480, 55 L.Ed. 563; Hampton, Jr., & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624; Federal Radio Commission v. Nelson Bros. Bond & Mtg. Co., 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166; A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 530, 55 S.Ct. 837, 843, 79 L.Ed. 1570, 97 A.L.R. 947. As said in the case last cited: "We pointed out in the Panama Refining Company Case [Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446] that the Constitution has never been regarded as denying to Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the Legislature is to apply."

There was no delegation of anything to the growers by reason of the referendum provided for. That was imposed as a limitation upon the discretion of the Secretary. He could not designate a market without the approval of two-thirds of the growers voting in such a referendum; but he was not bound to order the referendum in any market or to designate the market even after the requisite two-thirds vote of growers in a referendum

ordered. The growers were absolutely without power, therefore, to invoke the provisions of the law; and such cases as Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160, and Eubank v. City of Richmond, 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156, 42 L.R.A.,N.S., 1123, Ann.Cas.1914B, 192, have no application. The situation presented is more like that under consideration in Doty v. Love, 295 U.S. 64, 55 S.Ct. 558, 561, 79 L.Ed. 1303, 96 A.L.R. 1438, wherein a state statute, authorizing the superintendent of banks to reopen the bank on certain contingencies, made the exercise of his discretion dependent upon a favorable vote of three-fourths of the depositors. In that case, the court, speaking through Mr. Justice Cardozo, said: "The argument will not hold that the necessary operation of the statute is to subject dissenting creditors, who may be as many as one-fourth, to the will or the whim of the assenting three-fourths. The creditors favoring reorganization, though they be 99 per cent., have no power under the statute to impose their will on a minority. They may advise and recommend, but they are powerless to coerce. Their recommendation will be ineffective unless approved by the superintendent. Even if approved by him, it will be ineffective unless the court after a hearing shall find it to be wise and just. Upon such a hearing every objection to the plan in point of law or policy may be submitted and considered. The decree when made by the chancellor will represent his own unfettered judgment. The judicial power has not been delegated to nonjudicial agencies or to persons or factions interested in the event."

The vote provided for is no more a delegation of governmental power than is the vote of creditors required as a condition of approval of a plan of reorganization under section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207; and it is required on the same principle, i. e., to insure that a vested discretion will not be exercised contrary to the desire of the persons most interested. In the case of Cusack Co. v. City of Chicago, 242 U.S. 526, 37 S.Ct. 190, 192, 61 L.Ed. 472, L.R.A.1918A, 136 Ann. Cas.1917C, 594, the court had under consideration an ordinance which forbade the erection of signboards in any block on any public street, but permitted such erection upon the consent in writing of owners of a majority of the frontage of the property in the block. In sustaining the ordinance the court distinguished Eubank v. Richmond, supra, on a principle which is seen to be applicable here, when it is remembered that the vote of the growers here may prevent the establishment of a market by the Secretary but may not require it. The court said in that case: "A sufficient distinction between the ordinance there considered and the one at bar is plain. The former left the establishment of the building line untouched until the lot owners should act, and then made the street committee the mere automatic register of that action, and gave to it the effect of law. The ordinance in the case at bar absolutely prohibits the erection of any billboards in the blocks designated, but permits this prohibition to be modified with the consent of the persons who are to be most affected by such modification. The one ordinance permits two thirds of the lot owners to impose restrictions upon the other property in the block, while the other permits one half of the lot owners to remove a restriction from the other property owners. This is not a delegation of legislative power, but is, as we have seen, a familiar provision affecting the enforcement of laws and ordinances."

We see no merit in the questions raised under the Fifth Amendment. It is clear, of course, that the requiring of grading and inspection was a proper regulation of auction sales of tobacco. Cf. United States v. Shreveport Grain & Elevator Co., 287 U.S. 77, 53 S.Ct. 42, 77 L.Ed. 175; Townsend v. Yeomans, 301 U. S. 441, 57 S.Ct. 842, 81 L.Ed. 1210. And we see no ground of objection under the due process clause in the fact that inspection is provided under the designation of the Secretary in some markets before it is provided in others, and that the provisions of the act thereupon become applicable to such markets. There is no requirement that regulation of interstate commerce be uniform throughout the United States. Clark Distilling Co. v. Western Maryland R. Co., 242 U.S. 311, 327, 37 S.Ct. 180, 61 L.Ed. 326, L.R.A. 1917B, 1218, Ann.Cas.1917B, 845; Cooley v. Board of Wardens of Philadelphia, 12 How. 299, 318, 13 L.Ed. 996. When a market is designated for the inspection service provided by the act, all persons who buy or sell at auction in that market

are subject to its provisions; and the fact that persons who buy or sell on other markets are not subject thereto does not render the classification unreasonable or amount to a denial of due process or even of equal protection, if that were required. Fort Smith Light & Traction Co. v. Board of Improvement, 274 U.S. 387, 391, 47 S. Ct. 595, 597, 71 L.Ed. 1112; Mason v. Missouri, 179 U.S. 328, 21 S.Ct. 125, 45 L.Ed. 214; Missouri v. Lewis, 101 U.S. 22, 31, 25 L.Ed. 989. It is sufficient that "all persons subject to it are treated alike under similar circumstances and conditions in respect both of the privileges conferred and the liabilities imposed." Missouri Pac. R. Co. v. Mackey, 127 U.S. 205, 209, 8 S.Ct. 1161, 1163, 32 L.Ed. 107.

It is true that arbitrary discrimination between persons in similar circumstances would violate the due process clause; but it does not appear that there was arbitrary discrimination for or against anyone in the designation of the Oxford market for inspection service under the act. On the contrary, it appears that one reason for the designation of that market was that free government inspection and grading of a voluntary character had already been established there and the growers patronizing it had thus already been made familiar with the government service. The Secretary is vested with a discretion as to grouping markets for a referendum under the act, and nothing in the record indicates any abuse of this discretion on his part. The provisions of the act for the protection of the service are general in character, and become applicable when the market is designated and the service afforded; and we see no reason why putting a service of this sort into effect gradually, instead of all at once, should render the statute providing for it unconstitutional. The Grain Standards Act of 1916, § 4, 7 U.S.C.A. § 76, expressly provides for the shipment of grain without inspection from places for which no inspection is provided, although such shipment is penalized if made from places having inspection service; and it has never been suggested that the act is rendered unconstitutional by reason of containing such a provision.

For the reasons stated the decree appealed from will be reversed and the cause will be remanded with direction to dismiss the bill.

Reversed.