**NEWPORT NEWS SHIPBUILDING & DRY DOCK CO. et al. v. NATIONAL LABOR RELATIONS BOARD.**

No. 4390.

Circuit Court of Appeals, Fourth Circuit.

Feb. 28, 1939.

842

PARKER, Circuit Judge, dissenting in part.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

Fred H. Skinner, of Newport News, Va. (John Marshall, of Newport News, Va., on the brief), for petitioner Newport News Shipbuilding & Dry Dock Co.

Frank A. Kearney, of Phoebus, Va., for petitioner Employees' Representative Committee of Newport News Shipbuilding & Dry Dock Co.

A. Norman Somers, Atty., National Labor Relations Board, of Washington, D. C. (Charles Fahy, Gen. Counsel, Rob-ert B. Watts, Associate Gen. Counsel, and Laurence A. Knapp and Mortimer B. Wolf, all of Washington, D. C., Attys., National Labor Relations Board, on the brief), for respondent.

SOPER, Circuit Judge.

This case comes before the court on petition of the Newport News Shipbuilding and Dry Dock Company to review and set aside an order of the National Labor Relations Board issued against it, and upon the answer of the Board which prays that the petition be dismissed and the order enforced. The controversy grows out of a charge filed with the Board on June 12, 1937, by the Industrial Union of Marine & Shipbuilding Workers of America, that in March, May and June, 1937, the Shipbuilding Company had discharged and refused to reinstate seven named employees because they had joined a labor organization and had engaged in concerted activities for collective bargaining; and that the Shipbuilding Company had dominated and interfered with the employees' right of self organization by dominating, interfering with, and lending financial support to a labor organization in its plant known as Representation of Employees. Upon this charge the Board formulated the complaint that these acts of the Shipbuilding Company constituted unfair labor practices within the meaning of section 8 (1), (2) and (3) of the National Labor Relations Act, 29 U.S.C.A. §§ 151 et seq., 158(1–3).

Pursuant to section 10(b) of the Act, 29 U.S.C.A. § 160(b), the labor organization known as Representation of Employees, or Employees' Representative Committee, was allowed to intervene and answer the complaint.

Evidence was taken before a trial examiner who filed a report sustaining the charges as to the discharge of certain of the seven employees, and as to the domination and interference with the employees' organization. When the case subsequently came before the Board, it held that the evidence did not support the charge that the company had unlawfully discharged the named employees, but it found that the company had dominated and interfered with the formation and administration of the Employees' Representative Committee, and had contributed to its support, and therefore, had engaged in unfair labor practices within the meaning

of section 8 (1) and (2) of the Act. The Board ordered the employer to cease and desist from such practices, and to withdraw all recognition from the Employees' Representative Committee, as the representative of its employees with respect to grievances or labor disputes, and also to completely disestablish the Committee as such representative.

The first question which arises on the petition is as to the jurisdiction of the Board, i. e., whether the operations of the Shipbuilding Company are so connected with interstate and foreign commerce that the unfair labor practices alleged come within the Board's jurisdiction as affecting such commerce. On this question we think that the decision of the Board upholding its jurisdiction was clearly correct. A considerable portion of the business consisted of repairing and overhauling instrumentalities of interstate and foreign commerce. Between July 1935 and August 1937 it serviced 322 vessels for private interests at a billing price of more than $3,000,000; and between June 1934 and the date of the hearing it had under construction for private interests two tug boats and a tank barge, at contract prices aggregating $1,020,000. Therefore, even if its construction of naval vessels were ignored, its operations must be held to affect interstate commerce substantially; and, as separation of the two types of work is impracticable, the power of Congress with respect to the regulation of the entire business must be upheld. Consolidated Edison Co. v. National Labor Board, 59 S.Ct. 206, 83 L.Ed. ——; National Labor Relations Board v. Jones & Laughlin Steel Co., 301 U.S. 1, 57 S.Ct. 615, 81 L. Ed. 893, 108 A.L.R. 1352; The Shreveport Case, Houston, E. & W. T. R. Co. v. U. S., 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341; Wallace v. Currin, 4 Cir., 95 F. 2d 856; Virginian Ry. Co. v. System Federation No. 40, 4 Cir., 84 F.2d 641, affirmed 300 U.S. 515, 536, 57 S.Ct. 592, 81 L.Ed. 789.

But we do not think that the construction of naval vessels in which the company is chiefly engaged, can be ignored. It may be noted in passing that while these vessels are not designed to serve as carriers of commodities for sale or barter, they are intended to navigate the public waters of the United States and to transport persons and property from state to state and to foreign countries (cf. Gilman v. Philadelphia, 3 Wall. 713, 724, 18 L.Ed. 96; Gloucester Ferry Co. v. Pennsylvania, 114 U.S. 196, 203, 5 S.Ct. 826, 29 L.Ed. 158; Caminetti v. United States, 242 U.S. 470, 492, 37 S.Ct. 192, 61 L.Ed. 442, L. R.A.1917F, 502, Ann.Cas.1917B, 1168); but the regulatory power of Congress may be safely rested upon the fact that by far the greater part of the materials used in the construction of the vessels is received in interstate commerce, which would be affected, if the work of construction should be obstructed by industrial strife. The company employed 6697 persons at the time of the hearing. During the year 1936 91.4% of the business consisted in building men-of-war for the United States Navy, 5.8% in repair work, and 2.8% in the construction of hydraulic turbines and miscellaneous work. During this year the total purchases of materials was $7,479,-418 of which only $815,423.54, or 10.9%, were made within the state, the remainder representing interstate shipments. From January to August 1937, the purchases were $5,594,240, of which only $494,351.33, or 8.8%, were made within the state. If, therefore, the purpose of construction be ignored and it be assumed that the construction is of articles which are to have no relation to interstate or foreign commerce, a sufficient ground for regulation appears in the effect of the purchases on interstate commerce, which is within the power and duty of Congress to regulate and protect. If practices in the business will affect such commerce, Congress, under the clearest principles, has the power to regulate them. We have so held with respect to manufacturing products grown within a state for transportation in interstate commerce. Mooresville Cotton Mills v. National Labor Relations Board, 4 Cir., 94 F.2d 61. The Supreme Court so held with respect to the canning, packing and shipping of agricultural products grown within a state but shipped in interstate commerce, Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954. There can be no difference in principle between the case in which manufacture precedes and that in which it follows interstate commerce. If the flow of commerce is obstructed by labor disputes, it can make no difference from which direction the obstruction is applied.

The second question in the case is whether the evidence justifies the order

844

of the Board requiring the disestablishment of the Employees' Representative Committee. The findings of fact upon which the Board found that the Shipbuilding Company had been guilty of dominating and interfering with the Committee were as follows:

"In 1927, in cooperation with its employees, the respondent put into effect at the shipyard a plan of employee representation known as Representation of Employees. The purposes of the plan were stated in its preamble as follows:

"In order to give the employees of the Company a voice in regard to the conditions under which they labor, and to provide an orderly and expeditious procedure for the prevention and adjustment of any future differences, and to anticipate the problem of continuous employment, a method of representation of employees is to be established.

"Provision was made for the election, annually, by the employees of 21 white and 7 colored representatives. The elected representatives each were paid $100 per year by the respondent for serving in that capacity. Persons holding supervisory positions were ineligible to serve as representatives or to vote for representatives.

"The administration of the plan was vested in four* joint committees, consisting respectively of five of the elected representatives and not more than an equal number of representatives chosen from among the employees by the management. The plan provided, in addition, for a so-called Management's Representative whose function it was 'to keep the management in touch with the representatives and represent the management in negotiations with their officers and committees.' A provision calling for the arbitration of differences became operative only upon concurrence of the respondent's president. Amendment of the plan required the affirmative vote of two-thirds of the full membership of one of the joint committees, namely, the Committee on Rules (which included representatives appointed by the management), or of a majority of all the employees' representatives and representatives of management at an annual conference. The independence of action of elected representatives was 'guaranteed' by permitting them to take questions of discrimination 'to any of the Superior Officers, to the Joint Committee and to the President of the Company.' The plan contained no provision for the payment of dues.

"The original plan was revised in 1929, 1931, 1934, 1936, and finally, in 1937. The 1931 revision, which remained in effect without material change until 1937, differed from the first plan in the following respects: One white and one colored employee representative were elected by the employees in each department and division, and the respondent appointed an equal number of management representatives. The annual remuneration paid elected representatives by the respondent was reduced to $60. Instead of four governing joint committees a General Joint Committee was set up to administer the plan, composed of all elected representatives and all representatives of management, a majority of each class of representatives constituting a quorum. The secretary of the General Joint Committee was paid $5 monthly by the respondent. An executive committee also was established, comprising five elected employee representatives and five representatives of management. Elections were arranged for by the management representatives 'but insofar as possible conducted by the employees themselves.' Procedure was established for the adjustment of individual employee grievances. It provided that in the event of failure of settlement the respondent's president be notified. Under the plan, the General Joint Committee met monthly to take action upon matters presented by the Management Representative or by employee representatives or subcommittees, but finality of the action of the General Joint Committee was made dependent upon approval by the respondent's president. So, too, amendment of the plan, which could be accomplished by a two-thirds vote of the entire General Joint Committee, became effective 'when approved by the President of the Company.' * * *

"The plan's final revision occurred in May, 1937, after the Supreme Court of the United States upheld the constitutionality of the Act. It originated in the General Joint Committee one-half of whose members, as indicated above, represented the interests of the respondent. It was referred for suggestions to the similarly

* There were in fact five joint committees.

consisted executive committee and to the elected employee representatives separately. On May 20, 1937, after the Management's Representative announced that the revision was acceptable to the respondent, it was adopted by the General Joint Committee, to take effect June 30. Robeson, the personnel manager, and Woodward, the general manager of the respondent, took an active part in the revision of the plan.

"The Secretary of the Committee, Irving Clark Wilkins, testified that this change was undertaken in order to bring the plan 'within the letter as well as within the spirit of the Wagner Act.' * * It is apparent that the procedure which was followed was that of amendment under the existing plan, a procedure which required the consent of the respondent * * *.

" * * * The two principal changes were the elimination of compensation paid to elected representatives by the respondent, and the substitution for the General Joint Committee and the joint executive committee of a single Employees' Representative Committee (the intervenor herein), composed solely of employee representatives elected by the employees. The plan (Board's Exhibit No. 1K) provides, however, that the action of the Employees' Representative Committee 'shall be final, and become effective upon agreement by the company' (Article VI), and that any article in the plan may be amended by a vote of two-thirds of the entire membership of the Committee, which 'amendments shall be in effect at the time specified by the Employees' Representative Committee, unless disapproved by the company within 15 days after their passage' (Article IX). The plan contemplates a grievance procedure concluding with presentation of the grievance to the respondent's personnel manager or its general manager in the event no settlement has theretofore been effected. * * *

"As revised May 20, 1937, the plan has been in operation at the respondent's shipyard since June 30, 1937. The revised plan was printed in booklet form at the respondent's expense and distributed by the supervisors in each department. Copies of the minutes of each meeting held by the Committee are duplicated at the respondent's expense on stationery provided by it and are distributed to the representatives through the yard mailing service. One such copy is regularly sent to the respondent's personnel manager, and one is posted on the respondent's bulletin board in the shipyard."

Upon these findings, the Board concluded that the Company, from the inception of the plan in 1927 until its revision in 1937, had dominated and interfered with the formation and administration of the Employees' Representative Committee, and had contributed to its support, thereby interfering with the employees in the exercise of the rights guaranteed in section 7 of the Act, 29 U.S.C.A. § 157. With respect to the revision of the plan in 1937, the Board said that "the provisions of the plan as revised, no less than the manner of its revision, indicate that it is still the creature" of the employer; and, therefore, the Committee was held to be incapable of serving the employees as their genuine representative for the purpose of collective bargaining.

■ When the Board finds that an employer has created and fostered a labor organization of its employees, and has dominated its administration, in violation of section 8 of the National Labor Relations Act, and the finding is supported by substantial evidence, the Board has authority under section 10(c) of the Act to require him to withdraw all recognition to the organization as the representative of his employees. This rule was established in National Labor Relations Board v. Greyhound Lines, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307, and National Labor Relations Board v. Pacific Lines, 303 U.S. 272, 58 S.Ct. 577, 82 L.Ed. 838, and has been followed and applied by this court in National Labor Relations Board v. J. Freezer & Son, 4 Cir., 95 F.2d 840; National Labor Relations Board v. Wallace Mfg. Co., 4 Cir., 95 F.2d 818, 819; National Labor Relations Board v. Eagle Mfg. Co., 4 Cir., 99 F.2d 930; Virginia Ferry Co. v. National Labor Relations Board, 4 Cir., 101 F.2d 103, decided January 9, 1939; see, also, National Labor Relations Board v. Oregon Worsted Co., 9 Cir., 96 F.2d 193; National Labor Relations Board v. America Potash & C. Corp., 9 Cir., 98 F.2d 488.

■ In setting out the factual basis for the application of this rule of law in the pending case, the Board made no mention of certain facts that were proved either by uncontradicted evidence or by stipula-

tion of counsel. The omission doubtless occurred because in the opinion of the Board the facts referred to were immaterial to the issue; but, in our view, they must be taken into consideration since they bear directly upon the inquiry whether or not the Employees' Representative Committee is capable of representing the employees in collective bargaining, free from domination or interference by the employer. These facts are as follows:

During the whole life of the plan from 1927 until the time of the hearing before the trial examiner in August and September, 1937, the company has not interfered with, discouraged, encouraged or in any way prevented the selection by the employees of representatives of their own choosing.

Any employee below the grade of leading man, who is twenty-one years of age and an American born citizen, and who has been on the pay roll for one year, is eligible for election as a representative. All employees below the grade of leading man, who have been on the payroll for sixty days prior to the date fixed for nominations, are entitled to vote. The entire shipyard is divided into districts for the purpose of nominations and elections, so as to give each craft and each group of workmen a representative.

Nominations and elections are conducted exclusively by the employees in accordance with rules prescribed by the Executive Committee of the Employees' Representative Committee. The plan requires that nominations and elections shall be made by secret ballot, and shall be so conducted as to avoid undue influence or interference, and to ensure fairness in the count. The ballots used are printed and furnished by the employees, and all expenses of the election since 1935 have been borne out of a fund contributed by the employees in 1929 and 1930.

A majority of the employees in each voting district are satisfied with the plan and with what has been accomplished under it.

In 1927 the plan was submitted to the employees for their adoption or rejection, and it was adopted by a vote of 2430 to 204.

On June 15, 1937, 5718 out of 6300 eligible voters at work on that day, elected 43 representatives on the Employees' Representative Committee, 28 white and 15 colored, to serve from July 1, 1937, to June 30, 1938.

On June 7, 1938, after the employees had been notified of the recommendation made by the trial examiner on March 9, 1938, that the Employees' Representative Committee be disestablished, a referendum with reference to the continuance of the plan was held. 3455 workers voted to continue the plan, 562 voted to discontinue the plan, and 51 ballots were void.

On June 14, 1938, the annual election was held. 4233 out of 4889 men present at work elected 43 representatives to serve from July 1, 1938, to June 30, 1939. 42 votes were thrown out.

The management of the Shipbuilding Company has always been willing to negotiate with the Committee in regard to any matter affecting wages, hours or conditions of work, and the Committee has been successful from time to time in securing changes in these respects beneficial to the men.

There has been no action on the part of the management or by any officers or persons in a supervisory capacity in the shipyard, to discourage membership in any union.

For more than forty-three years prior to the hearing, there has been no labor dispute or disturbance that has interfered with the operation of the yard.

In addition to these uncontradicted facts, it is noteworthy that equal representation of the management and of the men on the joint committees prior to July 5, 1935, was not obnoxious to any statute then in force. The revision of the plan in 1937 was undertaken for the purpose of bringing the plan into literal harmony with the statute after doubts as to the constitutionality of the statute had been quieted by the decision of the Supreme Court in National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, on April 12, 1937. The revision was adopted on May 20, 1937 to take effect on June 30, 1937, after it had been considered in meetings of the General Joint Committee and in conference with the General Manager and Personnel Manager of the Company. The provisions for the payment of compensation to representatives on the Committee by the Shipbuilding Company, and for the appointment of representatives of the company on the Com-

mittee were eliminated. Two features were retained which have given rise to considerable discussion in this case, that is, the provisions in Article VI of the plan that the action of the Committee "shall be final and become effective upon agreement by the Company", and the provision in Article IX that the plan may be amended by a vote of two-thirds of the Committee, which amendments shall be in effect at the time specified by the Committee, "unless disapproved by the company within fifteen days after their passage."

The Shipbuilding Company and the Employees' Representative Committee assert that the provisions of Articles VI and IX were understood by them to apply to matters pertaining to the rights of the company under the plan, and were not intended to affect or restrict the independence of the committee in its capacity as a representative of the men. The Board on its part contends that the plan clothes the company with power in each instance to veto every proposal adopted by the committee, and every proposed amendment to the plan itself. In our opinion, the view of the Shipbuilding·Company and the Employees' Committee is more nearly correct, and it is of significance that in the actual operation of the plan, the provisions objected to have never been invoked by the company. The controversy, however, is no longer of importance, since both of the provisions have now been eliminated from the plan. During the argument of the case in this court, counsel were invited to discuss the propriety of a modification of the order of the Board so as to require the elimination of the provisions objected to, rather than a disestablishment of the organization. Counsel for the intervening organization stated that on its behalf he had unsuccessfully requested the Board to advise him what changes in its opinion would render the plan free from objection. Counsel for the Board requested the privilege of filing additional briefs, and this privilege was accorded to all parties. We learn, from the briefs filed in reply to the Board's supplemental brief, that Articles VI and IX have been amended by striking therefrom the provisions to which objections have been lodged.

■ When all of the circumstances of the case are considered, including not only the findings in the Board's opinion, but also the additional undisputed facts above set out, the inference that the Employees' Representative Committee "is still the creature of the company", to use the language of the Board, cannot in our opinion be reasonably drawn. It was certainly not reprehensible for the men to confer with the management when important changes were to be made in a plan, lawful in its inception, that had served long and successfully to foster peaceable relations and satisfactory working conditions in the plant; and there is no reason to doubt the sincerity of the declaration in the preamble of the revised plan that the purpose was to ensure the employees of the company full freedom in self organization and in the designation of representatives of their own choosing for the purpose of negotiating the terms and conditions of their employment. Consequently, there is no reasonable ground upon which the disestablishment of the organization of the men can be sustained. The National Labor Relations Act, 29 U.S.C.A. § 151 et seq., was designed to deal with the actualities of industrial life in this country, and to promote peace in relations between employer and employees by securing to employees the right, too frequently denied in the past, to organize and bargain collectively, with complete freedom and independence, through representatives of their own choosing. The purpose of the Act will not be served by destroying an organization that is without doubt the chosen representative of the great majority of the employees, even though it may be thought that their decision to restrict their spokesmen to American born fellow workmen is unwise. To deny them this right is to ignore the express command of the statute.

■ It was in accord with the duty of the Board as a prosecuting agency for the enforcement of the law to take note of those features of the plan that involved participation by the company in the administration of the organization and persisted after the enactment of the statute; and that duty also justified a critical examination of the revised plan to ascertain whether there was still danger of interference on the part of the employer. But it was also important to take cognizance of the undoubted service that the organization had previously rendered to men and management alike, and of the insistence of the men upon the preservation of their organization, and to note their sincere desire to eliminate in form as well as in sub-

stance every opportunity of the employer to a future share in the administration. That has now been accomplished and there is no longer any basis for the conclusion that the present plan is incapable of serving as a sincere representative of the employees for the purpose of collective bargaining.

 The order of the Board should be enforced in its negative provisions 1 (a) and (b) that the Shipbuilding Company cease and desist from dominating or interfering with the administration of the Employees' Representative Committee or the formation or administration of any other labor organization of its employees, and from contributing to the support of the Representative Committee, and also from in any other manner interfering with, restraining or coercing its employees in the exercise of the right of self organization, &c.; and also in the affirmative provisions, 2 (b), (c) and (d) requiring the posting and maintaining of notices of the order throughout the plant. Such an order is justified under National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307, even though, as appears in this case, the order has already been partly obeyed. But the provisions of Section 2 (a) of the order, which requires that all recognition of the Employees' Representative Committee be withdrawn and that the Committee be disestablished, should be eliminated.

A decree will be signed directing the enforcement of the order of the Board, with the elimination of Section 2 (a) therefrom.

Modified.

PARKER, Circuit Judge (concurring in part and dissenting in part).

I concur in so much of the opinion of the Court as holds that the Board had jurisdiction to enter the order here in controversy and that its cease and desist provisions and section 2 (b), (c) and (d) of its affirmative provisions should be enforced. I dissent from the holding that section 2 (a) should not be enforced.

The Court properly sustains the Board in the finding that petitioner has been guilty of dominating and interfering with the Employees' Representative Committee in contravention of the Act and enforces the cease and desist provision of the order

for that reason. Whether, upon this finding, petitioner should be required to withdraw recognition from the committee and disestablish it as a bargaining agency was an administrative matter committed by Congress to the sound discretion of the Board; and the Court is not authorized to substitute its discretion with regard thereto for that of the Board. National Labor Relations Board v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Pacific Greyhound Lines, 303 U.S. 272, 275, 58 S. Ct. 577, 82 L.Ed. 838. Only where there is a departure from law, action without substantial evidence to justify it or action so arbitrary and unreasonable as to amount to an abuse of discretion, is the Court justified in refusing enforcement of an order entered by the Board in exercise of the power entrusted to it by Congress. When the Court enforces the cease and desist provisions of the order, it recognizes that the finding of unfair labor practices was based upon substantial evidence and that some action by the Board was warranted by law. I do not think that, in the light of that finding, the portion of the order disestablishing the bargaining agency can be condemned as an abuse of discretion.

The finding of the Board that there was domination of the committee by the company prior to the 1937 change in the plan, was not based upon technical or trivial matters, but upon a showing of domination of the clearest character. As originally adopted in 1927 the plan provided that petitioner should appoint a number of representatives equal to the number elected by the employees to sit on committees with the latter and negotiate with petitioner in behalf of the employees. As no action could be taken by the committees except by vote of a majority, this gave the representatives of petitioner power to paralyze any movement even for the presentation of demands by the employees. It is suggested that the representatives appointed by petitioner were to bargain with the representatives of the employees, but this is negatived by the fact that provision was made for a company representative to perform this function, and that no action of the committees was to have any binding effect unless approved by the president of petitioner. No change in the plan could be made except by a two-thirds

vote and with the approval of petitioner's president. In addition to this, petitioner paid each of the representatives at one time $100 and at another $60 per year for service in that capacity, it paid the secretary of the committee $5 per month for his service in that capacity, and it defrayed all expenses of the committee, such as printing of ballots, printing of plan of organization and the like.

In the light of this history of the plan, the Board, I think, was thoroughly justified in concluding that the 1937 change in the plan would not remove the dominating influence of the company obtained through the preceding ten year period. The committee was an established institution functioning in accordance with techniques developed through years of company domination. It was probably too much to hope that by a mere change in the plan it would change its character, rid itself of company influence and become a free bargaining agency such as the Act contemplates. Whether it could do so or not, was a matter for the Board to determine in the discharge of its administrative function; and the Board may well have concluded that only by disestablishing the committee as a bargaining agency and starting anew could free and untrammelled action on the part of the employees be secured. As said by the Supreme Court in the Pennsylvania Greyhound Lines case, supra: "Section 10(e), 29 U.S.C.A. § 160(e) declares that the Board's findings of fact 'if supported by evidence, shall be conclusive.' Whether the continued recognition of the Employees Association by respondents would in itself be a continuing obstacle to the exercise of the employees' right of self-organization and to bargain collectively through representatives of their own choosing, is an inference of fact to be drawn by the Board from the evidence reviewed in its subsidiary findings. See Swayne & Hoyt v. United States, 300 U.S. 297, 57 S.Ct. 478, 81 L.Ed. 659." [303 U.S. 261, 58 S.Ct. 576.]

And what was said by the Supreme Court in the very recent case of Consolidated Edison Co. v. National Labor Relations Board, 59 S.Ct. 206, 220, 83 L.Ed. ——, is apposite, viz.: "The power to command affirmative action is remedial, not punitive, and is to be exercised in aid of the Board's authority to restrain violations and as a means of removing or avoiding the consequences of violation where those consequences are of a kind to thwart the purposes of the Act. *The continued existence of a company union established by unfair labor practices or of a union dominated by the employer is a consequence of violation of the Act whose continuance thwarts the purposes of the Act and renders ineffective any order restraining the unfair practices.*" (Italics supplied.)

Where there is evidence in the record to sustain the findings and order of the Board, I do not think that it is within our power to consider whether other findings are not also supported by the record, which, if made, might justify different action. The making of findings and determination of administrative action thereon, as heretofore stated, is a matter for the Board and not for us. Our right to make findings from the record in cases coming to us from the Labor Board is no broader than in cases coming from the Board of Tax Appeals; and with respect to our power in the latter class of cases the Supreme Court, in the case of General Utilities & Operating Co. v. Helvering, 296 U.S. 200, 206, 56 S.Ct. 185, 187, 80 L.Ed. 154, said: "Recently (April, 1935) this court pointed out: 'The Court of Appeals is without power, on review of proceedings of the Board of Tax Appeals, to make any findings of fact. * * * The function of the court is to decide whether the correct rule of law was applied to the facts found; and whether there was substantial evidence before the Board to support the findings made. * * * If the Board has failed to make an essential finding and the record on review is insufficient to provide the basis for a final determination, the proper procedure is to remand the case for further proceedings before the Board. * * * And the same procedure is appropriate even when the findings omitted by the Board might be supplied from examination of the record.' Helvering v. Rankin, 295 U.S. 123, 131, 132, 55 S.Ct. 732, 736, 79 L.Ed. 1343."

The case at bar furnishes good illustration of the wisdom of this rule. The Board found that "the provisions of the plan as revised, no less than the manner of its revision, indicate that it is still the creature" of the employer, resting this conclusion upon the facts as found by it in detail and set forth in the majority

opinion. In considering other facts not mentioned by the Board, because doubtless deemed immaterial to the issue, the Court is without the benefit of the finding which the Board might have made with respect to these facts had it considered them in connection with other facts appearing in the record and bearing upon the same matters. Thus, along with the fact that under the plan the employees vote for representatives without interference on the part of the company, the Board would doubtless have considered the fact that under the agreement for collective bargaining which the plan embodies the employees are limited in their choice of representatives to employees of the company, to the exclusion of an outside union as a bargaining agent. Along with the fact that the company is willing to negotiate with the committee, the Board would doubtless have considered the fact that the plan makes no provision for the meetings of employees or for instructing representatives as to their wishes, matters deemed material and expressly mentioned in the opinion in the Pennsylvania Greyhound Lines case (303 U.S. at page 270, 58 S.Ct. 571).

The first of these matters is, to my mind, very material if we are to go behind the findings of the Board and consider the record. Section 7 of the National Labor Relations Act provides that "employees shall have the right * * * to bargain collectively through representatives of their own choosing". 29 U.S.C.A. § 157. Any plan or agreement which limits their choice of such representatives is contrary to the reason and spirit of the Act as well as violative of this section; and an agreement for collective bargaining which provides that the bargaining representatives shall be employees of the employer excludes the possibility of selecting an outside union as bargaining agent, and thus limits the employees in the freedom of choice which it was the purpose of the Act to guarantee. This does not mean, of course, that the employees may not select their fellow employees as representatives, nor does it mean that they may not select a committee or inside union of their fellow employees as a bargaining agency. What it does mean is that, in selecting their representatives, they must be free to select whom they will, and not be bound by any plan or agreement with their employer to limit their selection in such way as to exclude an outside union.

For the reasons stated, I am of the opinion that the order of the Board should be enforced as entered.