# MASON v. MISSOURI.

ERROR TO THE SUPREME COURT OF THE STATE OF MISSOURI.

No. 258.   Argued October 25, 26, 1900.—Decided December 10, 1900.

The Supreme Court of the State of Missouri having decided that the provision of the state constitution respecting the enactment of registration laws does not limit the power of the general assembly to create more than one class composed of cities having a population in excess of one hundred thousand inhabitants, this conclusion must be accepted by this court.

The general right to vote in the State of Missouri is primarily derived from the State; and the elective franchise, if one of the fundamental privileges and immunities of the citizens of St. Louis, as citizens of Missouri and of the United States, is clearly such franchise, as regulated and established by the laws or constitution of the State in which it is to be exercised.

The power to classify cities with reference to their population having been exercised, in this case, in conformity with the constitution of the State, the circumstance that the registration law in force in the city of St. Louis was made to differ in essential particulars from that which regulated the conduct of elections in other cities in the State of Missouri, does not, in itself, deny to the citizens of St. Louis the equal protection of the laws; nor did the exercise by the general assembly of Missouri of the discretion vested in it by law, give rise to a violation of the Fourteenth Amendment to the Constitution of the United States.

By an act of the general assembly of the State of Missouri, approved on May 31, 1895, provision was made for the registration of voters in cities which then had or thereafter might have a population of over one hundred thousand inhabitants. This law became operative in the cities of St. Louis, Kansas City and St. Joseph. On June 19, 1899, the governor of Missouri approved an act of the general assembly, known as the Nesbit law, which made provision for the registration of voters in cities in Missouri which then had or might thereafter have a population of over three hundred thousand inhabitants. At the time the Nesbit law went into operation it affected only the city of St. Louis, which was the only city in Missouri having a population of over three hundred thousand inhabitants.

The defendant relators were appointed a board of election commissioners under the Nesbit law, and certain expenditures having been incurred in carrying the law into effect, the board applied to the plaintiff in error, in his official capacity as auditor of the city of St. Louis, to examine, audit and pass upon the accounts of the board, as required by law. Compliance with such request having been refused, the present litigation was commenced by the filing on January 5, 1900, in the Supreme Court of Missouri of a petition for a writ of mandamus, to compel the performance by the plaintiff in error of the duty in question. An alternative writ having issued, a return was filed, in which it was averred that the law under which the relators claimed to act was void, because repugnant both to the constitution of Missouri and the Constitution of the United States. The incompatibility between the law in question and the Constitution of the United States was rested upon the contention that the provision of the law "deprives the citizens of the United States residing in the city of St. Louis of their right to the equal protection of the laws, and imposes on citizens of said city unconstitutional requirements as preliminary to their right to vote and hold office."

Issue having been joined by the filing of a reply, the matter was heard by the Supreme Court of Missouri, and that court awarded a peremptory writ. 55 S. W. Rep. 636. It also overruled a petition for a rehearing. A writ of error was thereupon allowed by the Chief Justice of the state Supreme Court.

As the most convenient form of stating the contentions of the plaintiff in error, we excerpt from the brief of counsel a statement of the proposition relied on :

"We maintain that this Nesbit law does deny to the citizens of St. Louis the equal protection of the laws in these respects :

"(*a*) It denies them the right of appeal to any court from the action of the precinct boards of registration and from the action of the board of election commissioners, in striking their names from the registration lists, as qualified voters, while in cities of 100,000 inhabitants and up to 300,000 inhabitants, under the provisions of the law of 1895, this right is secured.

It is secured so completely by the last named law that an appeal lies even to the highest court of the State.

"(b) It denies them the right of appeal to any court or judicial tribunal from the action of the precinct boards of registration or from the action of the election commissioners in admitting to registration or in refusing to strike from the registration lists of qualified voters persons who are not entitled to register or to vote—a right secured to all citizens by the law of 1895 in cities and counties of 100,000 and not exceeding 300,000 inhabitants.

"(c) It allows a partisan board to add hundreds and even thousands of names to the registration lists, which names are unknown to the voters till the day of election, and have been subjected to no canvass as to their right to remain on the lists as registered qualified voters. If a citizen of St. Louis registers in his own precinct, under the Nesbit law, or names are placed on the registration lists in the precinct by the precinct boards of registration during the three days allowed by the law for registration in the precinct, the Nesbit law requires, as does the law of 1895, that the clerks, representing parties of opposite politics, shall go together to each house or room from which the party registers, and ascertain, by personal inquiry, whether or no the party registered actually resides at that place.

"But if the party has registered at the office of the board of election commissioners, which he may do on all such days on which registration is not conducted in the precincts, which days of precinct registration are the Tuesday four weeks before the election, the Saturday following, and the third Tuesday before the election, and which he may do even on the Thursday, Friday and Saturday immediately preceding the election—there is no canvass or examination whatever provided by the Nesbit law of his right to do so; his name is placed on the registration and poll books by the commissioners, their deputy or clerks—all appointed by vote of a majority of the board—and it appears on the day of election as the name of a qualified voter of the precinct. Thus a marked distinction is made by the Nesbit law between those who register or have their names placed on the registration lists at the office of the election commissioners and

those who register in their own precinct. The latter are subjected to close and bi-partisan scrutiny; the former go unchallenged and uncontested. Under the law of 1895 this cannot occur, for no registration under that law can be made in the office of the board of election commissioners, but all must be made in the several precincts, and all is subject to rigid bi-partisan scrutiny and canvass. This latter is the law in all cities of 100,000 and up to 300,000 inhabitants, and the former is the Nesbit law for all cities—meaning St. Louis alone—of over 300,000 inhabitants.

"(*d*) Under the Nesbit law the judges and clerks of election for each precinct, who are also the registration and canvassing officers for those precincts, are all appointed by vote of a majority of the board of election commissioners—a majority necessarily partisan. This majority selects them arbitrarily — true, the law says they shall be of 'opposite politics'— but whether of opposite politics or not, whether fit persons or not, whether intelligent or not, is left to the uncontrolled, arbitrary and exclusive determination of the majority of the board. This in St. Louis alone. In all other cities of 100,000 and up to 300,000 inhabitants 'the commissioner or commissioners shall select the judges and clerks to represent the party to which said commissioner or commissioners belong;' and the person selected shall be intelligent, educated, etc., and 'shall be recognized members of the party from which selected.' The names of those selected shall be filed in the Circuit Court and published, and any elector may file objections to the persons so selected and have his objections heard and determined by the court. If sustained, new names are submitted by the commissioners until fit persons are secured; and that being done, the appointments made by the commissioners are confirmed by the court. The court names no one; it only hears and passes on names objected to, and then confirms the approved appointees of the commissioners.

"(*e*) The Nesbit law is so partisan as to deny to all citizens in St. Louis, not members of the political party to which the two majority members of the board belong, the equal protection of the law. This is apparent on the face of the law. In this

respect it is in strong contrast with the law of 1895. In our statement we have set forth the leading features of the two laws and we will not repeat them here, but refer to that statement in support of this proposition. Where a State recognizes political parties by its laws as does the State of Missouri by numerous provisions, then it must do so equally for all—it must grant to all its citizens equality of right and protection— and this it has done in the enactment of this Nesbit law; and in that has violated the Fourteenth Amendment to the Constitution of the United States. It has done this, not only as between St. Louis and all other cities of over 100,000 inhabitants, but in St. Louis itself it has made such distinction between parties in that city as to deprive all citizens of that city who are not members of the political party to which the majority of the board belongs of the equal protection of the law.

"(*f*) The Nesbit law involves a denial of the equal protection of the laws, in that it provides penalties which are different in degree and character for offences than are prescribed for the same offences by the law of 1895 and by the general statutes of the State; that is, the same offence committed in the city of St. Louis is punished one way under the Nesbit law; if committed in Kansas City or St. Joseph, or in any other city of 100,000 and not having 300,000 inhabitants, it is punished in another way under the law of 1895; and if committed in the State at large it is punished in yet another way under the general laws. Furthermore certain acts are crimes if committed in one locality in the State, but not so when committed in another.

\* \* \* \* \* \* \* \*

"(*g*) The law also imposes unconstitutional requirements on the citizens of St. Louis as requisite to the right to vote, in that it provides that a voter shall have resided in his election precinct at least 20 days prior to the election, and is not 'directly interested in any bet or wager depending upon the result of the election.' No such requirements are in article 8 of the state constitution; to enforce them on the citizens of St. Louis is for the legislature to attempt to add tests to them not authorized by the state constitution and not applied to the other citizens of this State."

*Mr. George D. Reynolds* and *Mr. George H. Shields* for plaintiff in error. *Mr. J. W. Noble* was on their brief.

*Mr. Samuel B. Jeffries* for defendants in error. *Mr. Edward C. Crow* was on his brief.

Mr. Justice White, after making the foregoing statement, delivered the opinion of the court.

The constitution of Missouri in force at the time of the enactment of the law of June 19, 1899, usually referred to as the Nesbit law, in addition to prescribing certain qualifications as necessary to the right to vote, empowered the general assembly of the State to " provide by law for the registration of voters in cities and counties having a population of more than one hundred thousand inhabitants ; " and further directed that the general assembly " may provide for such a registration in cities having a population exceeding twenty-five thousand inhabitants and not exceeding one hundred thousand, but not otherwise." A law approved May 31, 1895, applied to all cities having a population in excess of one hundred thousand inhabitants, and before the adoption of the Nesbit law, the act of 1895 was operative in the city of St. Louis. The Nesbit law, which applied to cities having a population of over three hundred thousand inhabitants, necessarily withdrew the city of St. Louis from the operation of the earlier statute.

The contention that the Nesbit law denied to citizens of St. Louis the equal protection of the laws, in violation of the first section of the Fourteenth Amendment to the Constitution of the United States, is based upon certain propositions, elaborated in the argument of counsel, which we have reproduced in the statement of the case.

The assertions referred to, it must be borne in mind, are made by a public official, who is seeking to avoid the performance of duties enjoined upon him by the law in question, and who does not allege that any particular rights possessed by him as an individual have been expressly invaded. Whether under the ruling in *Wiley* v. *Sinkler, ante,* 58, the plaintiff in error could properly raise the objection in question, we shall not deter-

mine, in view of the fact that the Supreme Court of Missouri entertained and considered the question whether the law in question violated the Constitution of the United States.

In its final analysis it is apparent that the reasoning urged to sustain the propositions relied on must rest upon the assumption that under the constitution of Missouri but one registration law can be enacted applicable to cities having a population in excess of one hundred thousand inhabitants, whatever the maximum number of inhabitants may be; that, as a natural consequence, the citizens of St. Louis cannot be classified separately from cities having a population in excess of one hundred thousand but less than three hundred thousand inhabitants, and that as the law of 1895 more effectually protected the exercise of the right and privilege of voting, and threw about the enjoyment of the right of suffrage greater safeguards than does the later law, therefore the last enactment denies to the citizens of the city of St. Louis the equal protection of the laws.

But the state Supreme Court has, in this case, decided that the provision of the state constitution respecting the enactment of registration laws does not limit the power of the general assembly to create more than one class composed of cities having a population in excess of one hundred thousand inhabitants, and hence that the Nesbit law was not repugnant to the state constitution. This conclusion must be accepted by this court. *Backus* v. *Fort Street Union Depot Co.*, 169 U. S. 557, 566; *Merchants' Bank* v. *Pennsylvania*, 167 U. S. 461, 462, and cases cited.

In one aspect the argument urged against the validity of the provisions of the Nesbit law depends merely on comparison of the requirements of that law with the act of 1895. All the other contentions are reducible to the proposition that a violation of the Fourteenth Amendment to the Constitution of the United States has resulted from the putting in force by the general assembly of Missouri, in cities having a population of over three hundred thousand inhabitants, of a registration law which, in the mind of a judicial tribunal, may not as effectually safeguard the right and privilege of voting as might be devised, considered alone or with reference to a prior enactment.

But the obvious answer is that the law in question has been declared to be valid under the constitution of the State. The general right to vote in the State of Missouri is primarily· derived from the State, *United States* v. *Reese,* 92 U. S. 214; and the elective franchise, if one of the fundamental privileges and immunities of the citizens of St. Louis, as citizens of Missouri and of the United States, is clearly such franchise " as regulated and ·established by the laws or constitution of the State in which it is to be exercised." *Blake* v. *McClung,* 172 U. S. 239, quoting from the opinion of Mr. Justice Washington ·at circuit in *Corfield* v. *Coryell,* 4 Wash. C. C. 380. The power to classify cities with reference to their population having been exercised in conformity with the constitution of the State, the circumstance that the registration law in force in the city of St. Louis was made to differ in essential particulars from that which regulates the conduct of elections in other cities in the State of Missouri, does not in itself deny to the citizens·of St. Louis the equal protection of the laws. Nor did the exercise by the general assembly of Missouri of the discretion vested in it by law give rise to a violation of the Fourteenth Amendment to the Constitution of the United States. *Chappell Chemical Co.* v. *Sulphur Mines Co.,* 172 U. S. 474, 475, and cases cited; *Maxwell* v. *Dow,* 176 U. S. 581, 598.

*Judgment affirmed.*