JAMES A. QUAREMBA, JAMES W. RALPH AND TRIFONIO RIZZO, PLAINTIFFS-APPELLANTS, v. ALEXANDER ALLAN, COUNTY CLERK OF BERGEN COUNTY, DEFENDANT-RESPONDENT, AND STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued January 22, 1975—Decided March 13, 1975.

(1)

4

Appellant *Mr. James A. Quaremba* argued the cause pro se.

*Mr. Donald Horowitz* argued the cause for appellants James W. Ralph and Trifonio Rizzo (*Messrs. Cummins, Cummins, Dunn, Horowitz & Pashman,* attorneys).

*Mr. Michael J. Ferrara,* County Counsel, argued the cause for respondent County Clerk of Bergen County.

*Mr. Stephen Skillman,* First Assistant Attorney General, argued the cause for respondent State of New Jersey (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

KOLOVSKY, P. J. A. D., Temporarily Assigned. This appeal is before us on certification granted, 66 *N. J.* 312 (1974), after the Appellate Division, in a reported opinion, 128 *N. J. Super.* 570 (App. Div. 1974), had affirmed the judgment in favor of defendant County Clerk entered in the trial court after a trial of plaintiffs' action for a declaratory judgment.[1]

Plaintiffs had been unsuccessful candidates at a primary election held on June 8, 1971 in Bergen County for the Republican nominations for State Senator (Quaremba and Ralph) and member of the Board of Chosen Freeholders (Rizzo). Three principal contentions are advanced by them in this action, instituted on March 28, 1972, in anticipation of the 1972 primary election at which they, respectively, proposed to seek the Republican nominations for county

---

[1] Only the Bergen County Clerk had originally been named as a defendant in plaintiffs' verified complaint. Judgment for defendant was entered on the return day of an order to show cause. On appeal, the Appellate Division affirmed but we then granted plaintiffs' motion for certification, vacated the lower courts' judgments and remanded the action for a plenary trial. The State intervened once the Attorney General had been given, at the trial court's direction, notice that the constitutional validity of *N. J. S. A.* 19:49–2 was questioned. See *R.* 4:28–4. The Attorney General's participation was limited to so much of the trial as involved the constitutional issue.

committeeman, presidential delegate at large and county freeholder.

First, they challenge as unconstitutional the provisions of *N. J. S. A.* 19:49–2 which regulate the positioning on the lines of a voting machine of the names of candidates for nomination at a primary election. Secondly, they contend that even though *N. J. S. A.* 19:23–24 expressly excepts from its provisions "counties where section 19:49–2 of the Revised Statutes applies," still the county clerk of such county should and must comply with the provisions of *N. J. S. A.* 19:23–24 and list all candidates for nomination to any given office, in the order determined by lot, in a single column or row. Finally, they assert that although defendant County Clerk of Bergen County purports to follow the provisions of *N. J. S. A.* 19:49–2, in fact he has abused his discretion and discriminated against candidates — such as plaintiffs — who are not affiliated with the Bergen County Republican organization.

We start with an analysis of the two sections of the Election Law to which plaintiffs refer.

*N. J. S. A.* 19:49–2, by its express terms, applies "in all counties where voting machines are or shall be used" and thus includes Bergen County. It provides that candidates for offices whose petitions are required to be filed with the county clerk and who file a joint petition and choose "the same designation or slogan" (county candidates) "shall be drawn for position on the ballot as a unit and shall have their names placed on the same line of the voting machine." Candidates for municipal or party office in any of the county's municipalities whose petition, filed with the municipal clerk, bears the same designation or slogan, and candidates whose petitions are filed with the Secretary of State, see *N. J. S. A.* 19:23–6, may, upon request and if the campaign manager of the county candidates consents thereto, have his or her name placed on the same line of the voting machine with those county candidates.

The section thus mandates that members of a group who have filed a joint petition be "placed on the same line of the voting machine" and that if there be more than one such group, a drawing be held between each group as a unit to determine the group's position on the voting machine. The section makes no other provisions for a drawing for the primary election, nor does it contain any directions governing the allotment to positions on the voting machines of candidates who are not part of such a group. Under the usual rule applicable to the construction of election laws, the absence of such legislative directions results in the leaving of the decisions as to those matters to the reasonable discretion of the county clerk. *Richardson v. Caputo,* 46 *N. J.* 3 (1965) ; see also *Perry v. Giuliano,* 46 *N. J. Super.* 550, 556 (App. Div. 1957).

(Such has been the uniform interpretation of *N. J. S. A.* 19:49–2 adopted in a series of decisions of the Appellate Division and the former Supreme Court. We leave for later consideration plaintiffs' argument that we should overrule those cases and hold that county clerks in counties having voting machines do not have such discretion and must also comply with the provisions of *N. J. S. A.* 19:23–24.)

So much of *N. J. S. A.* 19:49–2 as refers to primary elections had its genesis in *L.* 1941, *c.* 163, that section theretofore having referred only to the use of voting machines in general elections. A year later, by *L.* 1942, c. 50, the Legislature amended *N. J. S. A.* 19:23–24, the only then existing statute dealing with the positioning of candidates on ballots used in a primary election, to except from those provisions "counties where section 19:49–2 of the Revised Statutes applies."

On its face, the effect of that amendment was to limit the application of the pertinent provisions of *N. J. S. A.* 19:23–24 to counties where paper ballots were used[2], in

---

[2]The Secretary of State's records disclose that voting machines are used throughout 15 of the 21 counties and in part of Hunterdon

which case the statute mandated "separate ballots for each political party." *N. J. S. A.* 19:23–23.[3]

In cases to which *N. J. S. A.* 19:23–24 applies, the section requires that the county clerk — or the municipal clerk in cases where the nomination involves an office or party position to be filled only by the voters of that municipality — hold a drawing to determine the sequence in which the names of the candidates for nomination to a particular office are to be listed on their party's primary ballot. Where more than one person are to be nominated for a particular office and candidates therefor have asked to be bracketed, see *N. J. S. A.* 19:23–18, the bracketed names are to be treated as one.

County. In the remainder of Hunterdon County and in five other counties — Cumberland, Warren, Salem, Sussex and Gloucester — paper ballots were used exclusively until the adoption of the 1973 legislation, described in footnote 3, authorizing the use of electronic or mechanical voting systems. Gloucester and Sussex Counties have since adopted one of those systems and now use "ballot cards", as does Warren in part of the county.

[3] A similar mandate — "In primary elections the ballot cards of each political party shall be distinctly marked or shall be of a different color or tint," *N. J. S. A.* 19:53A–6(b) — appears in the recent legislation, *L.* 1973, c. 82, *N. J. S. A.* 19:53A–1 *et seq.*, by which counties were authorized to adopt an electronic or mechanical voting system.

In essence, those systems call for the voter's choice to be indicated by a "mark or punch" placed on a ballot card by a voting device which the voter is to use. The ballot card is required to be "of [a] size, design and stock suitable for processing by automatic data processing machines." *N. J. S. A.* 19:53A–6(b). The votes are tabulated by automatic tabulating equipment, "apparatus which automatically examines and counts votes recorded on ballot cards, and tabulates the results." *N. J. S. A.* 19:53A–1(a).

The titles of offices and the names of candidates appear on "ballot labels, * * * the pages, cards or other material containing [such titles and names] which are placed on the voting device." *N. J. S. A.* 19:53A–1(c). Provisions dealing with the arrangement of the office titles and names of candidates "in vertical columns or in a series of separate pages" are set forth in *N. J. S. A.* 19:53A–5.

Finally, *N. J. S. A.* 19:53A–13 provides that "the provisions of Title 19 of the Revised Statutes except as herein modified shall be applicable to the use of electronic voting systems in elections as herein provided for."

Finally, in recognition of other provisions of the Election Law requiring the municipal clerks to cause the official primary ballots to be printed (except in counties falling within the population classification of *N. J. S. A.* 19:23–22.4 and 22.5, where the county clerk is to have the ballots printed and then be reimbursed for the cost thereof by the municipalities), the section concludes:

> The county clerk in certifying to the municipal clerk the offices to be filled and the names of candidates to be printed upon the primary election ballots, *shall certify them in the order as drawn in accordance with the above described procedure*, and the municipal clerk shall print the names upon the ballots as so certified and in addition shall print the names of such candidates as have filed petitions with him in the order as determined as a result of the drawing as above described. [Emphasis supplied].

. Thus, *N. J. S. A.* 19:23–24 makes no provision for grouping of candidates for different offices even though they may have chosen the same designation or slogan; what the section requires is that all candidates for a particular office be placed together on the ballot in the sequence determined by a drawing.

█ Plaintiffs' attack on the constitutionality of *N. J. S. A.* 19:49–2 is bottomed on the claim that those affected by its provisions are denied the equal protection of the laws because, allegedly, the statute improperly: (1) "creates preferred classes of primary candidates"; (2) favors "candidates and voters in rural counties which use paper ballots * * * over candidates and voters in populous counties which use voting machines"; (3) favors "candidates in counties using voting machines * * * who file a joint petition and those who affiliate with them * * * over all other candidates"; and (4) imposes an unequal burden on unaffiliated candidates and thus denies them their constitutional rights.

We are satisfied that there is no merit to any of plaintiffs' constitutional arguments.

█ As we said in *Sadloch v. Allan,* 25 *N. J.* 118, 122 (1957):

Since the exhaustive and instructive opinions in *Wene v. Meyner*, 13 *N. J.* 185 (1953), and *Stevenson v. Gilfert*, 13 *N. J.* 496 (1953), there can be no doubt about the authority of the Legislature to adopt reasonable regulations for the conduct of primary and general elections. *Such regulations, of course, may control the manner of preparation of the ballot, so long as they do not prevent a qualified elector from exercising his constitutional right to vote for any person he chooses. Rose v. Parker*, 91 *N. J. L.* 84, 86 (Sup. Ct. 1917). [Emphasis supplied].

■ Nothing in the challenged section inhibits any voter from voting for any person he chooses or limits the right of any candidate to run for office. The fact that different procedures are provided governing the positioning of the names of candidates when voting machines are used than when paper ballots are used does not result in a denial, either to the voters or the candidates, of the equal protection of the laws.

Apposite are the comments recently made by the United States Supreme Court in rejecting an attack on the constitutionality of a Texas statute which provided that "small parties" must choose their candidates at conventions and permitted major parties to choose their candidates by primary election:

\* \* \* If claiming an equal protection violation, the appellants' burden was to demonstrate in the first instance a discrimination against them of some substance. "Statutes create many classifications which do not deny equal protection; it is only 'invidious discrimination' which offends the Constitution." *Ferguson v. Skrupa*, 372 *U. S.* 726, 732, 83 *S. Ct.* 1028, 1032, 10 *L. Ed.* 2d 93 (1963) (footnote omitted). Appellants' burden is not satisfied by mere assertions that small parties must proceed by convention when major parties are permitted to choose their candidates by primary election. The procedures are different, but the Equal Protection Clause does not necessarily forbid the one in preference to the other. [*American Party of Texas v. White*, 415 *U. S.* 767, 94 *S. Ct.* 1296, 1306, 39 *L. Ed.* 2d 744 (1974), reh. den. 416 *U. S.* 1000, 94 *S. Ct.* 2414, 40 *L. Ed.* 2d 777 (1974).]

■ Even if we were to disregard the presumption of validity which attaches to *N. J. S. A.* 19:49–2, it is clear that it is not invidiously discriminatory. The obvious differences

in the physical makeup of the face of a voting machine and a paper ballot afford a reasonable basis for the Legislature's decision to provide different procedures governing the listing of candidates' names on the face of a voting machine than are provided for listing such names when paper ballots are used. *Cf. Richardson v. Caputo*, 46 *N. J.* 3 (1965).

When paper ballots are used in primary elections, separate ballots are provided for each political party and the size and length of the ballot may be expanded if the number of candidates seeking nomination to the several offices requires it. The contrary is true where voting machines are used.

In such case, the names of candidates for nomination by all parties appear on the one face of the machine which is equipped with a device by which the election officials "can lock out all rows except those of the voter's party." *N. J. S. A.* 19:48–1 (g). The number of lines on the voting machine are limited, see *N. J. S. A.* 19:48–1 (b) — those in use in Bergen County have either 40 or 50 lines — thus making it impossible to have all candidates for a party's nomination in one column, if, as the record shows sometimes happens, the number of candidates of a particular party exceeds those numbers.

Of even greater significance is that a paper ballot is much easier to read than is the face of a voting machine, a factor which alone furnishes adequate support for the Legislature's determination that different provisions should govern the preparation of the face of the voting machine than govern the preparation of a paper ballot.

As we said in *Richardson v. Caputo, supra,* a case involving a general election:

The purpose of a ballot is to permit voters to record their will, and one must assume the Legislature intended a ballot so arranged that all voters may find their candidates with the least difficulty the total content of the ballot will permit. Here we can find no reason, and no one suggests a reason, to deny plaintiffs the benefit of their joint candidacy or to deny a voter who wants to advance the party

or the principles of the candidates an easy opportunity to find all of them. * * * [46 *N. J.* at 9].

   * * *

* * * whereas with respect to the paper ballot a voter wishing to vote for the candidates of a "party" would have no difficulty in finding all of them by simply running down the column, the voting machine ballot is not designed to permit such ease in voting. Rather one might have to follow a number of lines or columns to search out the candidates of his party, and this could be a considerable feat for a voter in the booth conscious of a queue on the other side of the curtain. [46 *N. J.* at 12–13].

Our comments in *Richardson* with reference to "candidates of a party" in a general election would be equally applicable to a voter in a primary election seeking the names of candidates who have filed a joint petition and candidates affiliated with them if the statute did not require, as it does, that they be placed on the same line of the voting machine.

   ■  Plaintiffs further argue that an unaffiliated candidate would draw more votes if his opponent's name were not grouped with those of candidates for other offices. Even if that be true, it affords no basis for invalidating, as unreasonable, the legislative determination that whatever the effect on an unaffiliated candidate, the public interest is better served by permitting a grouping of candidates having common aims or principles and authorizing those candidates "to have this fact brought to the attention of the voter in a primary election with the additional effectiveness produced by alignment of their names on the machine ballot * * *." *Harrison v. Jones,* 44 *N. J. Super.* 456, 461 (App. Div. 1957).

   ■  Finally, contrary to what plaintiffs suggest, it is of no constitutional moment that the section does not apply in the six counties which do not use voting machines. *Inganamort, et al. v. Bor. of Fort Lee, et al.,* 62 *N. J.* 521, 529 (1973); *Mason v. Missouri ex rel. McCaffery,* 179 *U. S.* 328, 21 *S. Ct.* 125, 45 L. Ed. 214 (1900).

   ■  We find no substance to plaintiffs' second contention — that the county clerk in counties using voting machines also must comply with the provisions of *N. J. S. A.* 19:23–

24 — nor are we persuaded that we should overrule the rulings to the contrary set forth in a series of prior judicial opinions. *Hawkes v. Gates,* 129 *N. J. L.* 5 (Sup. Ct. 1942); *In re Hoffman,* 134 *N. J. L.* 155 (Sup. Ct. 1946); *Bado v. Gilfert,* 13 *N. J. Super.* 363 (App. Div. 1951); *Harrison v. Jones,* 44 *N. J. Super.* 456, 462 (App. Div. 1957); *Farrington v. Falcey,* 96 *N. J. Super.* 409 (App. Div. 1967); *Moskowitz v. Grogan,* 101 *N. J. Super.* 111 (App. Div. 1968), certif. den. 51 *N. J.* 575 (1968).

■ There is no warrant for ignoring the express statement embodied in *N. J. S. A.* 19:23–24 excepting from its operation counties to which *N. J. S. A.* 19:49–2 applies. Nor would we be justified in failing to give full weight to the Legislature's evident acquiescence in the uniform judicial interpretation of *N. J. S. A.* 19:49–2 since 1942, when *Hawkes v. Gates, supra,* was decided. "[I]t must be presumed that the Legislature was aware of this ruling [in *Hawkes*] when it amended *N. J. S. A.* 19:49–2 in 1944, 1945, 1946 and 1948 without making any change therein affecting that holding." *Moskowitz v. Grogan, supra,* 101 *N. J. Super.* at 115.

* * * In construing a statute it is to be assumed that the Legislature is thoroughly conversant with its own legislation and the judicial construction placed thereon. *Barringer v. Miele,* 6 *N. J.* 139, 144 (1951). And the construction of a statute by the courts, supported by long acquiescence on the part of the Legislature or by continued use of the same language or failure to amend the statute, is evidence that such construction is in accord with the legislative intent. *Egan v. Erie R. Co.,* 29 *N. J.* 243, 250 (1959); *Barringer v. Miele, supra.* We think these rules of statutory construction are particularly applicable to the election laws, a subject matter with which the Legislature is intimately concerned. [*In re Keogh-Dwyer,* 45 *N. J.* 117, 120 (1965)].

Even more reason exists for applying the stated rule when, as here, the statute has been amended in other particulars, without change in the phraseology construed in prior judicial decisions. *D. L. & W. R. Co. v. Division of Tax Appeals,* 3 *N. J.* 27, 37–38 (1949), app. dism. 338 *U. S.* 946,

70 *S. Ct.* 488, 94 L. Ed. 583 (1950) ; *Missouri v. Ross,* 299 *U. S.* 72, 75, 57 *S. Ct.* 60, 62, 81 L. Ed. 46 (1936).

Plaintiffs' final contention requires a consideration of the scope of judicial review of the discretionary action of a county clerk in situations governed by *N. J. S. A.* 19:49–2.

Except for *Farrington v. Falcey, supra,* none of the cases cited above — *Hawkes v. Gates, In re Hoffman, Bado v. Gilfert, Harrison v. Jones, Farrington v. Falcey* and *Moskowitz v. Grogan* (all of which are briefly digested in the appendix attached hereto) — involved the issue of abuse of discretion. In none of them had the unsuccessful party asserted that the county clerk had abused his discretion. Rather the claim asserted, unsuccessfully in each case, was that the county clerk had no discretion and was compelled to take, by reason of *N. J. S. A.* 19:23–24, the action which he had refused to take.

In *Farrington v. Falcey, supra,* decided subsequent to the filing of our opinion in *Robinson v. Caputo,* 46 *N. J.* 3 (1965), the abuse of discretion issue was one of those raised by plaintiff but the court found as a fact that there had been no abuse of discretion.

*Richardson v. Caputo, supra,* dissipated whatever doubt theretofore may have existed with respect to the power of the courts to review a county clerk's exercise of discretion under the election laws. In *Richardson,* after noting that a county clerk's discretionary action was not "beyond judicial disapproval," we said:

Discretion, of course, is never the plaything of office. Rather it imports responsibility, a duty to act with reason. True, it is not for a court to choose one of several reasonable courses, for that choice is precisely what the Legislature left to another, *United Hunters Ass'n v. Adams,* 36 *N. J.* 288 (1962), but if it clearly appears the course taken is not rooted in reason, the bounds of the delegated authority have been exceeded and it is the duty of the court to say so. [46 *N. J.* at 9].

Whether or not a particular course taken by a county clerk in the exercise of the discretion vested in him by

*N. J. S. A.* 19:49–2 "clearly * * * is not rooted in reason" will depend on the specific facts and circumstances of that individual case. However, it is not inappropriate to set forth some general guidelines.

It is obvious that the county clerk must act in good faith and may not intentionally discriminate against any candidate or group of candidates.

██ In this case plaintiffs charged defendant with intentional and purposeful discrimination against non-organization candidates. However, as the trial court found and as the Appellate Division agreed, the evidence adduced did not furnish adequate support either for the charge of intentional discrimination or for plaintiffs' challenge to the good faith of defendant county clerk. Adequate basis for such charges is not to be found in plaintiffs' criticism of several of the 517 different forms of ballot defendant was called upon to prepare for the primary election. (The differing forms of ballot were required because not all candidates were to be voted for throughout the county; some were to be voted for only in one district or one municipality.)

Aside from the charge of intentional discrimination, plaintiffs' principal criticism was of the county clerk's refusal to structure the ballot in the form of a single column with the names of the candidates for each office, affiliated and non-affiliated, following each other in the sequence determined by a drawing and these in turn followed by a similar listing of candidates for the next office and so on.

Under that proposal, the names of those who had filed a joint petition for different offices and those who had affiliated with them, although appearing in a single column, would be separated from each other by the names of unaffiliated candidates seeking the same offices.

██ There is no merit to plaintiffs' contention that the ballots should be structured as they suggest. Indeed such a separation of the names of those affiliated candidates — unless they consent thereto — would be contrary to the legis-

lative purpose evident in *N. J. S. A.* 19:49–2. *Harrison v. Jones, supra,* at 44 *N. J. Super.* 461.

Nor is it an abuse of discretion for a county clerk to accord affiliated candidates a line of their own. "On the contrary he should [place them on a line of their own] if that course is feasible and if in the context of the whole ballot it would afford all the voters a clearer opportunity to find the candidates of their choice." *Richardson v. Caputo, supra,* 46 *N. J.* at 8; see also *Farrington v. Falcey, supra,* 96 *N. J. Super.* at 413–414. In such case, the assigned line should normally be exclusively that of the affiliated candidates. Unless space requirements dictate otherwise, unaffiliated candidates for the same or other offices should not be added to the line allocated to the affiliated candidates.

As we have noted, *N. J. S. A.* 19:49–2 does not mandate a drawing when there are no competing groups and only unaffiliated candidates. *Bado v. Gilfert, supra.* However, to eliminate any suggestion of favoritism, a proper exercise of the county clerk's discretion in that situation should normally call for a drawing among the unaffiliated candidates for each office and the listing of their names in a single column in the order determined by the drawing.

The same course normally should be followed as between unaffiliated candidates for a particular office without, of course, affecting the inclusion of the affiliated candidate for that office with his group. *Cf. Moskowitz v. Groyan, supra,* 101 *N. J. Super.* at 116.

Finally, unless impossible because of the physical limitations of the voting machine at a particular primary election, the county clerk must "give effect on the ballot to a consensual arrangement whereby all of the candidates at a given level agree to run on a line of their own for any given office with no other candidate * * *." [*Alaimo v. Burdge,* 63 *N. J.* 574, 575 (1973)].

As modified by this opinion, the judgment is affirmed. No costs to either party.

## *APPENDIX*

In *Hawkes v. Gates,* 129 *N. J. L.* 5 (Sup. Ct. 1942), an unaffiliated candidate for the Republican nomination for United States Senator sought: (a) to compel a drawing among all six candidates for that office even though one of them, by reason of the consent given the campaign manager of a group of candidates for county offices, was, pursuant to *N. J. S. A.* 19 :49–2, to be placed on the same line as that group; and (b) alternatively to have the names of the five unaffiliated candidates put on separate lines ahead of two groups of affiliated candidates between which a drawing had been held. After ruling that *N. J. S. A.* 19 :49–2 and not *N. J. S. A.* 19 :23–24 controlled, Judge Colie concluded:

Deeming that the actions of the County Clerk of Essex County, by his deputy, were discretionary, this court will not undertake to direct how that discretion shall be exercised. [at 11].

In *In re Hoffman,* 134 *N. J. L.* 155 (Sup. Ct. 1946), Chief Justice Case, giving controlling effect to *N. J. S. A.* 19 :49–2, rejected the contention of an unaffiliated candidate for the Republican nomination for governor that the county clerk had no discretion and was required to hold a drawing between him and his opponent who, with the consent of the campaign manager of a group of county candidates, had affiliated himself with that group.

In *Bado v. Gilfert,* 13 *N. J. Super.* 363 (App. Div. 1951), it appeared that no joint petitions had been filed with the county clerk. The court ruled that *N. J. S. A.* 19 :49–2 was controlling and sustained the county clerk's refusal to hold a drawing and his announced decision that "he had the authority to decide himself on the positions" to be allocated the several candidates.

In *Harrison v. Jones,* 44 *N. J. Super.* 456 (App. Div. 1957), the court upheld the power of the county clerk to accept, where the delay was excusable, a belated consent by

the campaign manager of a county group to the affiliation of a group of municipal candidates, emphasizing that despite the delay the situation was governed by *N. J. S. A.* 19 :49–2.

In *Farrington v. Falcey,* 96 *N. J. Super.* 409 (App. Div. 1967), it appeared that the campaign manager[4] of a group of Democratic candidates for county office had consented to the affiliation with that group of two candidates for the Democratic nominations for State Senators. The campaign manager had refused a request for such affiliation by Farrington, who was also a candidate for nomination as State Senator.

Nevertheless the trial court, in an action instituted by Farrington, ordered the county clerk to place Farrington's name on the same line as that of the group. The Appellate Division reversed, ruling (1) that *N. J. S. A.* 19 :49–2 was a bar to the relief granted by the trial court, and (2) that even if the county clerk had the discretionary power to grant Farrington's request, his refusal to do so was not an abuse of discretion.

In *Moskowitz v. Grogan,* 101 *N. J. Super.* 111 (App. Div. 1968), certif. den. 51 *N. J.* 575 (1968), the court, again relying on *N. J. S. A.* 19 :49–2, held that since one slate of delegates to a national party convention was affiliated with a group of county candidates, another unaffiliated slate was not entitled to a drawing for position on the ballot as against the affiliated slate, "for the state can-

---

[4]As we have noted above, *N. J. S. A.* 19 :49–2 calls for a consent by the campaign manager of the county group, not by the county's party organization. Indeed *N. J. S. A.* 19 :34–52 provides:

No state, county or municipal committee of any political party shall prior to any primary election indorse the candidacy of any candidate for a party nomination or position.

The reference in the Appellate Division's opinion to the alleged fact that plaintiff's opponents had been "recognized by the regular Democratic organization of Mercer County" was improper but nevertheless did not infect the other reasons given by the court for its rulings.

didates who affiliate with county candidates may not be displaced from their position on the same line with their affiliated county candidates." [101 N. J. Super. at 116].

For affirmance as modified—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN and CLIFFORD and Judge KOLOVSKY—5.

For reversal—None.